***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award with modifications.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the deputy commissioner hearing as
 STIPULATIONS
1. On June 11, 1999, the date of plaintiff's injury, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. All parties have been correctly designated.
3. On June 11, 1996, the date of the injury herein, the relationship of employee and employer existed between Teresa Weatherman and Winston Printing Company.
4. On June 11, 1999, plaintiff suffered an injury by accident arising out of and in the course of plaintiff's employment with defendant when she fell while stripping packaging.
5. June 11, 1999, plaintiff average weekly wage was $350.29 resulting in a compensation rate of $233.53.
6. Defendants have acknowledged plaintiff's claim on a Form 63 dated July 6, 1999, and have paid temporary total disability benefits for the period June 12, 1999 through January 12, 2001, at the weekly rate of $200.00, pursuant to the Form 63.
7. Following a mediation conference on January 11, 2001, defendants increased plaintiff's weekly compensation rate to $233.53 on January 13, 2001. Defendants have paid temporary total disability benefits to plaintiff at the weekly rate of $233.53 since January 13, 2001.
8. On January 17, 2001 the carrier issued a check in the amount of $2,782.16 to plaintiff.
9. Defendants have agreed to pay related medical mileage, excluding duplicate submissions, and there is no longer a disputed issue with regard to such mileage.
10. On May 15, 2000, Dr. Ronald A. Geoffrey stated plaintiff was at maximum medical improvement and he assigned a twenty-percent permanent partial disability rating to plaintiff's back.
In addition, the parties stipulated into evidence the following:
 1. One hundred eleven pages of medical records and reports.
 2. A packet of Industrial Commission forms, motions, notices and orders.
3. Thirty-nine pages of discovery documents.
4. The written agreement reached at mediation.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following
 FINDINGS OF FACT
1. Plaintiff, who was forty-six years old at the time of the deputy commissioner hearing and who has a tenth grade education with a subsequent GED certificate, began working for defendant-employer on June 7, 1999 as a material handler. She had previously worked at the facility in a similar capacity while employed with another related company. Her job involved tearing off excess material from cigarette cartons, decals and packages produced by the company.
2. On June 11, 1999 plaintiff sustained a compensable injury by accident while pulling waste material off of packages. She slipped as she was pulling and fell, landing on the floor in a seated position. She heard a pop and immediately experienced pain in her back and down her right leg. Her employer sent her to Prime Care for treatment and she received conservative care for over a month at that facility. However, on July 9, 1999 the doctor recommended that she see an orthopedic surgeon. Defendants delayed authorization of the referral and on August 4, 1999 plaintiff went to the emergency room because she had run out of pain medicine. The emergency room physician also advised her to get appropriate medical treatment. Defendants subsequently sent her to Dr. Gioffre, an orthopedic surgeon in Greensboro.
3. Dr. Gioffre examined plaintiff on August 16, 1999. At that time she was complaining of severe back pain radiating to her groin and right leg. On examination, her reflexes were depressed. Dr. Gioffre prescribed steroid and pain medication and ordered a "stat" MRI, but defendants again delayed approval. When the test was finally performed, it revealed a ruptured disc at L1-2 which was pressing on the thecal sac with associated nerve compression. On August 31 when plaintiff returned for a follow-up, Dr. Gioffre noted weakness of her hip flexors and her dorsiflexors, and he recommended surgery on an urgent basis. The surgery was not performed until November 5, 1999, apparently due to further delays in insurance authorization, but Dr. Gioffre then operated to decompress the L1-2 interspace. Following the operation, plaintiff continued to experience pain, weakness and numbness in her right leg. She had to use a walker for six weeks and then switched to a cane.
4. Plaintiff's symptoms persisted despite further treatment. On April 26, 2000 Dr. Gioffre found marked spasms in her back and weakness of her hip flexors, her quadriceps and her dorsiflexors on examination, and his impression was that she had sustained significant injury to her spinal cord with neuropraxia as a result of the injury. However, he ordered another MRI to rule out another possible cause of her symptoms. Although the test showed a very small disc herniation, there was no evidence of neural compromise. Consequently, he concluded that her symptoms were due to neuropraxia. He continued to follow her until July 19, 2000. At that appointment he prescribed Oxycontin, a narcotic medication, for her to use for severe pain when Darvocet did not provide adequate relief. Since she had reached maximum medical improvement in his opinion, he released her from his care and advised her to go to her family doctor for continuing pain medication prescriptions. He expected her to require ongoing treatment and monitoring for her chronic symptoms.
5. Plaintiff then went to Dr. Beavers, a family doctor, on July 26, 2000. He continued the Oxycontin prescription and also prescribed medication for depression. During the next six months, he made changes to her medications and increased the Oxycontin dosage, but he ultimately decided that it would be prudent to get advice from a pain management specialist regarding her continuing medication regimen. Dr. Beavers referred plaintiff to Piedmont Anesthesia and Pain Consultants for advice concerning pain management.
6. In the meantime, defendants had refused to pay for the treatment by Dr. Beavers, because Dr. Gioffre had not put his recommendation regarding follow-up care in writing. Consequently, plaintiff tried to return to Dr. Gioffre but his office would not give her an appointment without prior authorization from the insurance company, and the insurance company would not give authorization. Dr. Beavers continued to treat plaintiff despite the issue of payment for his services.
7. Meanwhile, plaintiff's attorney sent her to Dr. Derian, an orthopedic surgeon specializing in spine surgery, for a second opinion. Dr. Derian examined plaintiff on December 7, 2000. Although she had some non-psychologic findings, Dr. Derian's impression was that plaintiff probably had neuropraxia at the conus level in addition to her post-surgical status and degenerative disc disease at multiple levels in the lumbar spine. In his opinion, no further surgery was indicated. He recommended that she undergo additional testing to rule out other potential causes for her symptoms since her condition was so unusual and her injury did not seem severe enough to have caused neuropraxia. He also indicated that she might benefit from a comprehensive pain management program. In addition, he agreed with the twenty percent permanent partial impairment rating Dr. Gioffre had given her and with Dr. Gioffre's conclusion that she was probably totally and permanently disabled from gainful employment.
8. Plaintiff had not undergone the additional testing recommended by Dr. Derian as of the date of the deputy commissioner hearing. Since the testing would not be specifically for her injury, defendants presumably denied authorization even though it would have had the potential of identifying another cause for her condition.
9. Plaintiff's symptoms improved with the various medications prescribed by Dr. Beavers. Nevertheless, in March 2001 he referred her to Piedmont Anesthesia and Pain Consultants, and on April 3, 2001 she was seen by Dr. Martin, an anesthesiologist and pain medicine specialist at that facility. Dr. Martin chose to disregard the diagnosis by the orthopedic surgeons and began aggressive treatment for what he diagnosed as lumbar radiculopathy and probable post-laminectomy syndrome. He significantly increased her dosage of Oxycontin and, as of the date of his deposition, was considering ordering a discogram and indicated that a spinal cord stimulator, a controversial procedure not widely accepted in medical practice, was a potential modality of treatment. Dr. Derian was of the opinion that the spinal cord stimulator was potentially dangerous, could lead to paralysis and should only be considered as a last resort after other treatment options had been pursued, including fusion surgery.
10. Defendants contend that the treatment provided and recommended by Piedmont Anesthesia and Pain Consultants was ill-advised and did not tend to effect a cure, provide relief or lessen plaintiff's disability. The Full Commission, however, notes that this pain clinic was not authorized to perform the requested diagnostic testing and initial treatment and therefore the full treatment plan for plaintiff was not established. The pain medications and treatment recommended by Dr. Martin and Piedmont Anesthesia and Pain Consultants, including the continuation of Oxycontin, is consistent with treatment by others doctors except that Dr. Martin has increased the dosage of Oxycontin. Further, Dr. Martin testified that he was not seeking to immediately use a spinal cord stimulator and that he would speak with Dr. Derian before prescribing this modality of treatment. The record, however, indicates that Dr. Martin's recommended treatment appears to be overly aggressive with excessive dosage of narcotics and premature discussion of controversial modalities of treatment. Based on the greater weight of the credible evidence, the Full Commission concludes that continued treatment with Piedmont Anesthesia and Pain Consultants is not in the best interest of plaintiff and that another facility should be considered for her pain management.
11. Defendants admitted liability for benefits under the Workers' Compensation Act for plaintiff's June 11, 1999 injury by accident pursuant to a Form 63 which was filed with the Industrial Commission. They paid compensation to her on an ongoing basis through the date of hearing. However, there have been ongoing problems with defendants causing delays in or failing to authorize needed medical treatment. Plaintiff has previously moved to have the Industrial Commission approve the treatment by Dr. Beavers and her motion was denied administratively. Consequently, she appealed the ruling and requested a hearing.
12. After the hearing on May 3, 2001, defendants sent plaintiff to Wake Forest University Baptist Medical Center for evaluation regarding whether she was a candidate for their functional rehabilitation program. Plaintiff was seen by Dr. Feldman, a psychologist, by a nurse and by a physical therapist at the facility. The team evaluated her and concluded that she should not be admitted to their program. Not only was she limited in her tolerance of physical activity but she viewed Social Security disability benefits as her only hope for the future and would have been resistant to improving her functional status because that would jeopardize her Social Security claim. Consequently, the one effort defendants made to provide treatment did not result in an actual treatment program being implemented.
13. In view of defendants' pattern of delaying approval of recommended medical treatment and in view of their failure to authorize or provide any medical treatment after Dr. Gioffre released plaintiff, plaintiff was entitled to choose a treating physician. It appears that the treatment by Dr. Beavers should therefore be approved. However, Dr. Beavers was apparently uncomfortable with prescribing the amount of narcotic medication plaintiff was receiving in March 2001 and wanted some advice from a specialist. Consequently, it appears that the case should be referred to the Nurses Section of the Industrial Commission for assistance in choosing a pain management specialist to provide that expertise. Should the parties have difficulty with the Nurses Section recommendation, they may mutually select another facility with the assistance of Dr. Derian.
14. Plaintiff has also claimed entitlement to treatment for depression and to compensation for total and permanent disability. Both of these issues have been clouded by the fact that she has been significantly exaggerating her symptoms to her physicians and to the Commission. Her claimed symptoms and physical limitations were materially inconsistent with her activities as observed and recorded by a private investigator. With respect to the depression issue, since plaintiff has suffered permanent limitations and impairment due to her injury, it would be reasonable for her to develop some degree of depression. The treatment provided by Dr. Beavers, in the form of prescription medication, was reasonably necessary to give plaintiff relief from the symptoms of depression which she experienced. However, since she clearly exaggerated the extent of her symptoms, no treatment beyond this continuing medical management should be authorized at this time.
15. Both Dr. Gioffre and Dr. Derian have indicated that plaintiff's impairments would prevent her from returning to work in her former capacity with defendant-employer. Neither doctor expected that she would be able to return to work in any capacity, so their medical reports did not contain work restrictions. These doctors, however, indicated that plaintiff may be able to perform some form of sedentary work. Considering that Dr. Beavers and Dr. Derian agree that plaintiff could benefit from pain management, and under the record before the Commission it is possible that plaintiff's degree of disability may improve with this treatment, it appears to be premature to evaluate whether plaintiff's current total incapacity is permanent or temporary.
16. This claim was defended with reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. Since defendants repeatedly delayed authorization of necessary treatment and would not provide any treatment for plaintiff after July 17, 2000, plaintiff's choice of Dr. Beavers as her treating physician is approved. G.S. § 97-2(19); G.S. § 97-25; Schofield v. The GreatAtlantic Pacific Tea Company, Inc. 299 N.C. 582 (1980).
2. Defendants shall pay for all medical treatment provided by Dr. Beavers for the injury in question, including the prescriptions for medication for pain and depression. In addition, defendants shall pay for the prescriptions for Oxycontin actually prescribed by Dr. Martin during the period Dr. Beavers deferred to him regarding medication management but only for the dosage previously prescribed by Dr. Beavers. G.S. § 97-2(19); G.S. § 97-25; Schofield v. The Great Atlantic Pacific Tea Company, Inc. 299 N.C. 582 (1980).
3. Plaintiff is entitled to continuing compensation at the rate of $233.53 per week, her full compensation rate, until she returns to gainful employment or further order by the Commission. N.C.G.S. §97-29.
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including the past evaluation and treatment rendered at Piedmont Anesthesia and Pain Consultants save and except for prescription for Oxycontin to the extent that Dr. Martin's prescription exceeded the dosage previously recommended by Dr. Beavers. N.C.G.S. §§ 97-2(19), 97-25; Schofield v. The GreatAtlantic Pacific Tea Company, Inc. 299 N.C. 582 (1980). Based on questions of the propriety of some of the modalities of care considered by Piedmont Anesthesia and Pain Consultants, the Commission declines to approve continued treatment with this facility. N.C.G.S. § 97-2(19),97-25. Plaintiff is entitled to participate in a pain management program, at another facility, selected by the Nurses Section of the Industrial Commission or by mutual agreement of the parties with the assistance of Dr. Derian.
5. Plaintiff is not entitled to have attorney's fees assessed against defendants in that there were legitimate issues raised by the evidence. G.S. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay to plaintiff continuing compensation for permanent disability at the rate of $233.53 per week until she returns to work or until further order of the Industrial Commission. This compensation is subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident including those arising out from treatment by Dr. Beavers, as stated above, and for a pain management program selected by the Nurses Section of the Industrial Commission or selected by mutual agreement of the parties with the assistance of Dr. Derian.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiff's counsel. Defendants shall pay him a lump sum from any accrued compensation and shall thereafter pay him every fourth check.
4. Defendants shall pay the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER